## ALLEN *v.* THREE THOUSAND ONE HUNDRED AND EIGHTY-THREE BUSHELS OF POTATOES.

*(District Court, E. D. New York. June 13, 1881.)*

1. **AFFREIGHTMENT—TRANSHIPMENT OF CARGO—LIEN—DUTIES.**

   Where a vessel with a cargo of potatoes from the British provinces went ashore on the coast of Maine, and the master, under telegraphic orders from the shippers and consignees, sold the cargo at auction, and part of it was at once shipped in another vessel to Boston, the purchasers paying the duties; and subsequently, and before all the potatoes were delivered, the master, under advice of the agent of the insurers of the cargo, broke off the trade, got the potatoes that had gone forward brought back, refunded the amount paid at auction and the duties paid, and reshipped all the sound part of the cargo in another vessel to New York, under a fresh bill of lading, for delivery to the original consignees there, and afterwards brought suit to recover freight and demurrage under the original bill of lading, and the amount of duties paid:

   *Held,* that the contract of affreightment was ended by the acts of the master in selling the cargo in Maine, and that he had no lien upon the potatoes transported to New York for the freight and demurrage provided for in the first bill of lading, nor for the sums he had refunded to the purchasers in Maine for duties paid.

*Scudder & Carter,* for libellant.

*McDaniel, Lummis & Souther,* for respondents.

BENEDICT, D. J. This action is brought to enforce a lien which the libellant claims to have upon a cargo of potatoes. The following facts appear:

The potatoes proceeded against are part of a cargo originally shipped by C. A. Harrington & Co. at Port William, Nova Scotia, in the schooner M. G. Porter, of which vessel the libellant was master, to be transported therein to the port of New York, and there delivered to Perkins & Job, they paying freight on delivery, the lump sum of $875. A bill of lading in the ordinary form, dated November 29, 1877, was signed by the libellant. The schooner sailed from Port William for New York, January 2, 1878. In the course of the voyage she met with a storm, and was stranded at Horman's cove, in the town of Brooklyn, in the state of Maine. The injuries caused to the vessel by the stranding were such as to render it impossible for her to continue the voyage. The potatoes were also thoroughly wet, and, as the weather was extremely cold, there was immediate danger of their total destruction. The master of the Porter at once, and by telegraph, informed the shippers and consignees of the cargo in regard to his situation. In reply, the shippers telegraphed to him to sell the cargo to best advantage of underwriters, and the consignees telegraphed him: "Loss must amount to 50 per cent. of entire cargo to recover from underwriters. Act for best interest of all concerned. Forward us protest and any proceeds soon as possible." Thereupon the master called a survey upon the cargo, and then sold it at public auction, as it lay in the vessel and subject to duties, for the sum of $200. The buyers at once took possession of the potatoes and entered them at the custom-house, paying the duties thereon. The buyers then loaded part of the potatoes in the schooner We're Here, and dispatched her to Boston. The remainder they commenced to cart over the fields to cellars to escape the frost, and some they stored in lighters.

By the time the greater portion of the cargo had been removed from the vessel the agent of the Boston Marine Insurance Company, a corporation which had insured the cargo and the freight, appeared at the vessel, and the weather meanwhile had become mild. The master of the Porter, upon representations of the underwriter's agent that the potatoes should have been transhipped, then made an arrangement with the buyer of the potatoes for a return of them to him. In accordance with this arrangement, the potatoes that had been stored in cellars and in lighters were delivered back to the master of the Porter. The We're Here, which had arrived at Boston after a voyage of a week or 10 days, was ordered back, and upon her return her cargo was also delivered to the master of the Porter, who thereupon paid to the buyer of the potatoes money equal in amount to that paid for them at the auction sale, together with the amount the buyer had paid at the custom-house for duties on the potatoes, and the additional sum of $200 for the expenses of the voyage of the We're Here to Boston and back. The sound portion of the potatoes, amounting to some 3,183 bushels, were then shipped by the master of the Porter, in his own name, on board the schooner Altevilia, to be transported therein under an ordinary bill of lading to the port of New York, and there delivered to Perkins & Job on their paying the sum of $500 freight. The Altevilia in due time arrived in the port of New York, with the potatoes on board, and they were there received by Perkins & Job, who paid the $500 freight provided for in the bill of lading of the Altevilia, and sold the potatoes, applying the net proceeds to the credit of C. Harrington & Co., the orig-

inal shippers, to whom they had made advances upon the faith of the bill of lading of the Porter. It was understood that the receipt of the potatoes by Perkins & Job should not prejudice their rights, and that the delivery of the potatoes to them should not affect any lien to which the potatoes might be subject. This action was then commenced by the master of the Porter to enforce a lien which he claimed to have upon the potatoes.

The libel does not clearly show what the precise claim of the libellant is; but plainly the action does not proceed upon the ground that there is any claim for *pro rata* freight. The demand, as stated upon the argument, is for the difference between the $500 freight paid the Altevilia and the freight provided for in the bill of lading of the Porter, $40 for 10 days' detention of the Porter at the port of lading, together with the sum of $488.18 paid by the libellant for duties on the potatoes in the state of Maine. Two questions have been in this way presented for determination, namely: Did the master of the Porter have a lien upon the potatoes transported to New York by the Altevilia for the freight and demurrage provided for in the bill of lading of the Porter? and, *secondly*, did the master of the Porter have a lien upon the potatoes transported by the Altevilia for duties upon the potatoes paid by him in the state of Maine? Upon both these questions my opinion is adverse to the libellant. When the Porter stranded on the coast of Maine the circumstances were such as to justify the master in selling the potatoes. He did sell them at public auction, and the fairness of the transaction has not been questioned. The sale was completed, and the potatoes were delivered to the buyers, who entered them at the custom-house and paid the duties due upon such entry. That sale terminated the existing contract of affreightment. After the potatoes had been thus sold and entered at the custom-house it was not within the power of the master to revive the original contract, and by regaining possession of the potatoes, and shipping them upon the Altevilia, to entitle himself to claim the freight agreed to be paid upon the delivery of her cargo by the Porter. No legal transhipment of cargo was effected. When the potatoes were shipped on board the Altevilia the relation between the master of the Porter and the potatoes, created by the shipment on the Porter, no longer existed. The potatoes were no longer the cargo of the Porter. They had not only passed from the possession of the master of the Porter, but their character had been changed by an entry at the custom-house. They had become imported goods, subjected to new relations, and perhaps to new liabilities. A new

value had been given to them by the payment of the duties. Moreover, they had in part been subjected to land transportation, and a part had been subjected to the risk of a new and different voyage, viz., to Boston. All the dealings of the master with the potatoes from the time of the stranding up to, I may say, the commencement of this suit, were inconsistent with the idea of a transhipment of his cargo for the purpose of earning the freight provided for by the bill of lading of the Porter. If a case may be imagined where the sale of a cargo, by the master, in good faith and under circumstances of justification, might be rescinded by the master for the purpose of effecting a transhipment of cargo, this is no such case. Here it was impossible for the master to restore matters to their former condition. By virtue of the authority conferred upon him by the circumstances, the master became empowered to sell the potatoes, and the power had been exercised. He had thereafter no power to buy them again for account of the consignees, nor any power to pay back duties on account of the consignees, nor, indeed, any power over them as agent of the consignees, and he had, by his own acts, lost the right to earn his freight by means of a transhipment. So he himself seems to have believed, for he made a new shipment of the potatoes on the Altevilia by a new bill of lading, which provided for a delivery on payment of a new freight, viz., $500. There is in the libel an averment that the insertion of the sum of $500, as freight, in the bill of lading of the Altevilia, was by mistake; but of this there is no proof. It is my opinion, therefore, that the potatoes in question, when received by Perkins & Job, were not subject to any lien for the freight and demurrage provided for in the bill of lading of the Porter.

The claim for duties is more untenable. In point of fact, the master of the Porter paid no duties on his cargo. What he did was to pay to the parties who had bought the potatoes, subject to duties, the sum they had paid for duties. I am unable to see any ground upon which to charge these potatoes with a lien for moneys paid without any authority from the freighters for such a purpose. As already stated, neither by the libel nor upon the argument has the question of the liability of the potatoes for *pro rata* freight—distance freight, as it is sometimes called—been presented. In cases where complete performance of a contract of affreightment has been rendered substantially impracticable, and benefit has accrued to the freighter by part performance of the contract, courts of admiralty do sometimes administer a larger equity than is permitted to courts of

law; but this case, as presented, does not call upon the court to exercise any such power in behalf of the libellant. See *Metcalfe* v. *Britannia Iron Works*, L. R. 12 B. D. 176.

The view already expressed renders it unnecessary to consider the serious question presented by the fact that the quantity of potatoes stated by the bill of lading of the Porter to have been shipped on board that vessel was never shipped or delivered to the master for the purpose of shipment, and by the act of the master, in signing a bill of lading known by him to be false, Perkins & Job had been induced to advance money to C. H. Harrington & Co. upon insufficient security.

There must be a decree dismissing the libel, and with costs.